## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **DONNIE W. ASCUE,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:13cv00057 |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | BY: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

### *I. Background and Standard of Review*

Plaintiff, Donnie W. Ascue, ("Ascue"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer based on consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Oral argument has not been requested; therefore, the matter is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

-1-

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Ascue protectively filed an application for DIB on January 23, 2010, alleging disability as of March 20, 2008, due to a broken leg, a replaced anterior cruciate ligament, ("ACL"), nerve damage in the back, severe back pain, difficulty focusing, problems with the right foot and right hip, bulging discs, anxiety and panic disorder. (R. at 13, 143-44, 202, 255.) The claim was denied initially and on reconsideration. (R. at 77-80, 86, 87-89, 91-93.) Ascue then requested a hearing before an administrative law judge, ("ALJ"), (R. at 94-95), which was held on June 21, 2012, and at which Ascue was represented by counsel. (R. at 25-56.)

By decision dated July 11, 2012, the ALJ denied Ascue's claim. (R. at 13-24.) The ALJ found that Ascue met the nondisability insured status requirements of the Act for DIB purposes through June 30, 2012. (R. at 15.) The ALJ also found that Ascue had not engaged in substantial gainful activity since March 20, 2008, the alleged onset date. (R. at 15.) The ALJ found that the medical evidence established that Ascue suffered from severe impairments, namely chronic back pain; chronic right leg pain, status-post fractures in three places after a forklift accident; chronic right foot pain; chronic right knee pain, status-post ACL replacement; major depressive disorder; panic disorder without agoraphobia; somatization disorder; and post-traumatic stress disorder, ("PTSD"), but he found

that Ascue did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15-17.) The ALJ found that Ascue had the residual functional capacity to perform a range of sedentary work,[1] which did not require more than occasional stooping, kneeling, crouching or crawling, and which did not require concentrated exposure to hazards, the performance of no more than simple job instructions and no more than occasional interaction with the general public. (R. at 17-22.) The ALJ found that Ascue was unable to perform any of his past relevant work. (R. at 22-23.) Based on Ascue's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Ascue could perform, including jobs as an addresser, an ampoule sealer[2] and a folder. (R. at 23-24.) Thus, the ALJ found that Ascue was not under a disability as defined under the Act and was not eligible for benefits. (R. at 24.) *See* 20 C.F.R. § 404.1520(g) (2014).

After the ALJ issued his decision, Ascue pursued his administrative appeals, (R. at 6-9), but the Appeals Council denied his request for review. (R. at 1-4.) Ascue then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2014). The case is before this court on Ascue's motion for summary judgment filed May 19, 2014, and the Commissioner's motion for summary judgment filed

---

[1] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing often is necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2014).

[2] An ampoule sealer seals ampoules filled with liquid drug products, preparatory to packaging.

-3-

July 21, 2014.

## II. Facts[3]

Ascue was born in 1975, (R. at 143), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). He has a high school education and some college course work. (R. at 29.) Ascue has past relevant work experience as a construction worker and a machine operator. (R. at 29-33.)

Ascue testified that he suffered a work accident in March 2008 while working as a machine operator, after which he quit working. (R. at 29-30.) A forklift overturned, crushing his leg, which required surgical repair. (R. at 31.) A rod was placed in his leg, which was held in place by screws in his ankle, but these screws were later removed because they caused constant, shooting pain. (R. at 31, 40, 41.) Ascue testified that, in addition to the leg injury, the accident had resulted in a back injury and neck pain. (R. at 34.) He stated that his neck pain was aggravated by sitting and relieved by lying down and medication. (R. at 34.) Ascue testified that he would lie down four to eight times daily. (R. at 34.) He described his back pain as intermittent, both dull and sharp, located in his low back, radiating into his right hip and aggravated by sitting. (R. at 34, 42.) According to Ascue, lying down and medication helped to relieve his back pain, as well. (R. at 35.) He stated that an MRI had revealed a ruptured disc. (R. at 42.) Ascue stated that he had difficulty bending, kneeling and stooping, and negotiating

---

[3] The undersigned's consideration of medical records is limited to those pertinent to the relevant time period of March 20, 2008, the alleged disability onset date, through June 30, 2012, Ascue's date last insured. To the extent that medical records pertaining to dates not pertinent to the relevant time period are contained herein, it is for clarity of the record.

-4-

steps and inclines worsened his pain. (R. at 42-43.)

Ascue testified that his leg pain was worse on the right side, radiated into his toes and was aggravated by standing. (R. at 35.) He estimated that he could stand or walk for up to 20 minutes without shooting pain. (R. at 41.) He stated that he also had dull knee pain from a replaced ACL, which was aggravated by standing. (R. at 35.) Ascue also stated that his knee would sometimes give way. (R. at 43.) He testified that medication, sitting and elevation helped both his leg and knee pain. (R. at 35.) Ascue estimated that he elevated his leg four to six times daily and that he had to recline every hour for 15 or 20 minutes. (R. at 35, 44.) He stated that he got up every two to three hours at night due to pain, resulting in no energy during the day. (R. at 44.) Ascue testified that he was taking Lortab for pain, which made him drowsy for two to three hours after taking it. (R. at 45.) He stated that he would lie down and try to "sleep it off." (R. at 45-46.) Ascue testified that he had joint pain and difficulty gripping, and he estimated that he could lift and carry items weighing up to 15 pounds. (R. at 46.)

Ascue also testified that he suffered from tremendous anxiety following his work injury, he was depressed, and he secluded himself. (R. at 36.) He testified that his treating physician prescribed Klonopin, but he experienced "pretty severe" side effects, noting that he "stayed knocked out." (R. at 36, 39.) He denied undergoing regular therapy or counseling. (R. at 36.) He stated that he avoided situations that made him anxious, such as going to Walmart. (R. at 40.) He stated that he sometimes had dreams about the accident. (R. at 43.) Ascue testified that his girlfriend performed most of the household chores. (R. at 37.) Ascue stated that he mostly stayed home, watched television, surfed the internet, spent time outside

in the yard and occasionally read. (R. at 37, 44.) He stated that he saw his mother once every two to three weeks and that a friend or two stopped by his house. (R. at 38.)

Jim Williams, a vocational expert, also was present and testified at Ascue's hearing. (R. at 47-55.) Williams classified his past work as a machine operator as medium[4] and skilled and as a construction worker as heavy[5] and semi-skilled. (R. at 50.) Williams testified that a hypothetical individual of Ascue's age, education and work history, who could perform sedentary work that required no more than occasional stooping, kneeling, crouching and crawling, which did not require concentrated exposure to hazards, which required the performance of no more than simple job instructions, and which required no more than occasional interaction with the general public, could not perform Ascue's past relevant work. (R. at 51.) Williams testified, however, that such an individual could perform other jobs existing in significant numbers in the national economy, including those of an addresser, an ampoule sealer and a folder in the textile industry. (R. at 51-52.) Williams next testified that the same individual, but who also would be seriously limited, resulting in unsatisfactory work performance, in his ability to deal with the public, to use judgment with the public, to deal with work stresses, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability, could not sustain employment. (R. at 52-53.) Next,

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2014).

[5] Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If an individual can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(d) (2014).

Williams testified that the first hypothetical individual, but who also had no useful ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment with the public, to interact with supervisors, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember and carry out complex job instructions, to understand, remember and carry out detailed job instructions, to understand, remember and carry out simple job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability, also could not sustain employment. (R. at 53.) Lastly, Williams testified that a hypothetical individual who would be absent more than two days monthly and who would never be able to climb, kneel, crouch and crawl could not perform any jobs. (R. at 53.)

In rendering his decision, the ALJ reviewed medical records from Wellmont Holston Valley Medical Center; Clinch Valley Medical Center; Appalachian Orthopaedic Associates; Wellmont Rehabilitation; Dr. Gurcharan Singh, M.D., a state agency physician; Louis Perrott, Ph.D., a state agency psychologist; Dr. Michael Hartman, M.D., a state agency physician; Mountain View Regional Medical Center; Norton Community Hospital; Dr. William H. Humphries, M.D.; Appalachian Family Health Center; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Appalachia Medical Clinic; Dr. Michael B. Ford, M.D.; Frontier Health Associates & Forensic Services; Dr. Kevin Blackwell, D.O.; Holston Valley Ambulatory Surgery Center; Medical Associates of Southwest Virginia; Lonesome Pine Hospital; Alexander Prosthetics & Orthotics, Inc.; and Park Avenue Physical Therapy. Ascue's attorney submitted additional medical records from Clinch Valley Medical Center and Norton Community Hospital to the

Case 2:13-cv-00057-PMS   Document 21   Filed 03/16/15   Page 7 of 42   Pageid#: 736

Appeals Council.[6]

On March 20, 2008, Ascue was admitted to Wellmont Holston Valley Medical Center after suffering a low-speed rollover forklift accident at work. (R. at 302-15.) X-rays revealed that Ascue had a closed segmental tibial shaft fracture, for which he underwent a closed reduction with intramedullary nailing by Dr. Bruce Miller, M.D., an orthopaedic surgeon. (R. at 302, 304-05, 307.) When Ascue saw Dr. Miller on April 1, 2008, for a surgical follow-up, he had no complaints, his incision sites were healing nicely, there were no signs of cellulitis or infection, his legs were in excellent alignment, and he was neurologically intact. (R. at 358.) Dr. Miller initiated outpatient physical therapy for Ascue's foot/ankle range of motion and gait training. (R. at 358.) He advised him to weight bear as tolerated, and he renewed his pain medication. (R. at 358.)

Ascue presented to Clinch Valley Medical Center on April 15, 2008, with complaints of right leg pain and swelling. (R. at 322-25.) A Doppler venous ultrasound of the right leg showed no evidence of deep venous thrombosis, and Ascue was diagnosed with cellulitis. (R. at 325, 499.) He was prescribed Percocet. (R. at 325.) On April 17, 2008, and again on April 21, 2008, Ascue underwent aquatic therapy for the cellulitis. (R. at 326-27.) On April 21, 2008, he reported that he was doing some better and felt like the pool helped some on the prior visit. (R. at 327.) Ascue stated that his knee bothered him more than his ankle. (R. at 327.) He was instructed to elevate his right leg and continue with ice to reduce

---

[6] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-4), this court also must take it into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

Case 2:13-cv-00057-PMS   Document 21   Filed 03/16/15   Page 8 of 42   Pageid#: 737

edema. (R. at 327.)

On April 23, 2008, when Ascue returned to Dr. Miller for routine follow-up, he again had no complaints. (R. at 357.) Dr. Miller noted that Ascue continued to take a "significant amount of narcotics." (R. at 357.) Objectively, Ascue's right lower extremity was normal, except his foot was lacking significant motion. (R. at 357.) Dr. Miller expressed concern regarding Ascue's narcotic use, his continued reliance on crutches, and his sparse physical therapy attendance. (R. at 357.)

Ascue attended aquatic therapy from April 24, 2008, through May 12, 2008. (R. at 328-33.) Over this time, he reported knee pain worse than ankle pain, as well as increased leg pain and instances of his knee giving way. (R. at 328-33.) On May 6, 2008, Ascue had some swelling and redness of the right leg, as well as an antalgic gait. (R. at 331.) He continued to exhibit an antalgic gait on May 12, 2008, at which time he was discharged from therapy. (R. at 333.)

When Ascue saw Dr. Miller on May 22, 2008, he was ambulatory without any assistive devices. (R. at 356.) However, he reported he felt like his leg gave out on him. (R. at 356.) Physical examination revealed full range of motion of the right knee, 4/5 quad strength, no pain with single leg balancing and a neurovascularly intact foot. (R. at 356.) Ascue could not single leg balance on the right leg secondary to ankle weakness and giving way. (R. at 356.) Dr. Miller cleared Ascue to return to work in a sedentary type job, and he advised him to continue physical therapy to improve gait and strengthening. (R. at 356.) Dr. Miller noted fairly significant weakness in the ankle and knee. (R. at 356.) X-rays showed a nicely healing fracture with no loosening of the rod or screws. (R. at 356.) Dr. Miller

-9-

renewed Ascue's Lortab prescription, and he prescribed therapy. (R. at 356.)

On June 11, 2008, Ascue saw Brandi Lawson, a physical therapist at Wellmont Rehabilitation for a Physical Therapy Evaluation of his right leg. (R. at 533-35.) He had only a very mildly antalgic gait and was able to achieve good heel strike. (R. at 533.) He also could negotiate stairs reciprocally using hand rails. (R. at 533.) There was some swelling about the lower leg and ankle, and he exhibited decreased range of motion in the right hip and in both knees and ankles. (R. at 533.) Ascue had decreased motor strength in the right hip, right knee and right ankle. (R. at 534.) Sensation was grossly intact to light touch except for reports of hypoesthesia over the lateral lower leg and dorsal surface of the foot. (R. at 534.) Ascue was diagnosed with increased right leg pain; decreased right leg range of motion; decreased right leg strength; increased right leg swelling and tenderness; and limited walking, sitting down and standing on tip toes to reach into cabinets. (R. at 534.) He was scheduled for therapy three times weekly for four weeks. (R. at 535.) Ascue attended physical therapy from June 13, 2008, through April 23, 2009. (R. at 511-31, 603.) Over this time, he received treatment with moist heat, cold packs and therapeutic flexibility exercises. (R. at 511-31, 603.) He complained of knee pain worse than ankle pain and episodes of his knee giving way causing him to fall. (R. at 513-14, 519-21, 524, 526-27.) On June 23, 2008, it was noted that Ascue's ankle range of motion and strength needed improvement. (R. at 527.) On July 16, 2008, he reported that his ankle had good days and bad days, but his range of motion was improving. (R. at 516.) By July 30, 2008, the physical therapist noted that Ascue's ankle was getting stronger, and by the time he was discharged from therapy on April 23, 2009, his condition was deemed "moderately improved," with his potential for further improvement, if maximum improvement was not

achieved, deemed as "fair." (R. at 511, 603.)

On June 24, 2008, Ascue returned to Dr. Miller with continued complaints of right knee pain, as well as right ankle pain and a feeling of the ankle giving way. (R. at 355.) Physical examination showed mild joint effusion and diffuse soreness of the knee to palpation, but with full range of motion. (R. at 355.) No ligamentous instability was appreciated, but Ascue was very tender to compression of the medial meniscus. (R. at 355.) He was nontender to deep palpation over the fracture site, but exhibited very weak inversion and eversion of the right ankle and foot. (R. at 355.) Sensation was intact, as were flexor and extensor tendons. (R. at 355.) Ascue had normal dorsiflexion and plantarflexion. (R. at 355.) Dr. Miller recommended an MRI of the right knee, and he continued physical therapy. (R. at 355.) He cleared Ascue to perform a sedentary job with no lifting, climbing, driving or prolonged sitting. (R. at 355.)

A June 30, 2008, MRI of the right knee showed a partial tear of the ACL with ganglion cyst, as well as mild edema in the region of the tibial plateau posteriorly, suggesting a mild residual bone bruise. (R. at 370.) On July 9, 2008, Ascue continued to complain of diffuse leg symptomatology including knee pain. (R. at 354.) On examination, Ascue was tender to palpation around the right ankle and tibial shaft. (R. at 354.) Based on the MRI, Dr. Miller diagnosed a right knee ACL rupture, likely occurring at the same time as the tibial shaft fracture. (R. at 354.) He advised that a reconstruction of the ACL was likely, but Ascue was not ready to proceed. (R. at 354.) Dr. Miller placed him in a hinged knee brace and continued aggressive rehab for the leg and ankle. (R. at 354.) He again cleared Ascue to return to light-duty work that did not require climbing, prolonged

standing or kneeling. (R. at 354.)

On July 25, 2008, Ascue was seen at Medical Associates of Southwest Virginia with a swollen and red right leg. (R. at 510.) He was diagnosed with cellulitis and was given Cephalexin. (R. at 510.)

Ascue returned to Wellmont Rehabilitation from August 7, 2008, through January 12, 2009. (R. at 604-10.) Over this time, Ascue continued to complain of leg, ankle and knee pain, as well as right low back and right hip pain. (R. at 604-10.) On September 16, 2008, Ascue exhibited a decreased range of motion of the right knee with numbness around the right knee extending down the right lower leg and ankle. (R. at 608.) He had fair straight leg raise testing. (R. at 608.) Lawson diagnosed decreased range of motion and strength and increased pain and swelling in the right leg. (R. at 609.) On October 22, 2008, Lawson noted that Ascue had made "moderate progress." (R. at 607.) On November 19, 2008, he complained of pain with exercises and feeling like his knee would buckle. (R. at 606.) On December 17, 2008, he continued to complain of pain with exercises. (R. at 605.) He also had sores on the right lower leg and complained of burning and itching. (R. at 605.) On January 12, 2009, Ascue complained of right knee pain, right low back pain and right hip pain. (R. at 604.) He was limited in all planes of motion in the right hip, but knee range of motion was good. (R. at 604.)

On August 12, 2008, despite complaints to Dr. Miller of severely worsening knee pain, Ascue could bear full weight unassisted. (R. at 353.) Physical examination showed only mild diffuse knee tenderness to stressing, the right leg was in excellent alignment, there were no signs of cellulitis or infection, and it was

neurovascularly intact. (R. at 353.) Dr. Miller recommended proceeding with the ACL reconstruction, to which Ascue agreed. (R. at 353.) Dr. Miller performed this reconstruction on September 8, 2008. (R. at 338-41.) By the second day after surgery, Ascue was ambulatory with the assistance of physical therapy and crutches and was discharged home on September 10, 2008, with weight bearing as tolerated, outpatient physical therapy and Percocet for pain. (R. at 338.)

On September 11, 2008, when Ascue saw Dr. Miller for a surgical follow-up, he was ambulatory with crutches. (R. at 352.) His incisions were healing nicely, there were no signs of cellulitis or infection, and Dr. Miller could gently flex him to about 90 degrees. (R. at 352.) He indicated that Ascue was progressing as expected and that he should begin outpatient physical therapy. (R. at 352.) On September 23, 2008, Ascue's range of motion was 90 degrees. (R. at 351.) Dr. Miller again advised physical therapy, and he placed Ascue in a hinged knee brace. (R. at 351.) On September 25, 2008, Ascue was fitted for the knee brace at Alexander Prosthetics & Orthotics, Inc., which he received on October 9, 2008. (R. at 594.)

On October 23, 2008, Ascue reported feeling "a little better." (R. at 350.) Range of motion was -30 to 120 degrees, and quad strength was 4+/5. (R. at 350.) His knee was quite stable to stressing, and he ambulated without assistance in the brace. (R. at 350.) Dr. Miller indicated that Ascue was progressing well, he continued him in physical therapy, and he cleared him to return to sedentary work. (R. at 350.) On November 20, 2008, Ascue was ambulatory without any assistive devices, and he reported that his pain was improving. (R. at 349.) Physical examination showed quad weakness at about 4/5 motor strength, but there was no

-13-

joint effusion of the knee, he had full range of motion, and ligamentously was very stable to stressing. (R. at 349.) There was no frank cellulitis, purulence, drainage or discharge. (R. at 349.) The foot was in good alignment, and the ankle had normal motion. (R. at 349.) Dr. Miller continued physical therapy, noting a lack of balance and strength, and Ascue was advised to continue use of the knee brace. (R. at 349.)

On January 13, 2009, Ascue reported that he could not return to full-duty work. (R. at 348.) Physical therapy notes indicated a lack in strength and balance in the right leg. (R. at 348.) Physical examination showed no ligamentous instability of the knee and full range of motion. (R. at 348.) Quad strength was still only about 4+/5, as well as knee flexion strength. (R. at 348.) Ascue's right foot and ankle also showed about 4/4- strength to inversion and eversion, and he could single leg stand for about 10 seconds. (R. at 348.) Dr. Miller diagnosed persistent right lower extremity muscle weakness, and, although he cleared Ascue for a light to moderate type job, he noted this was not available for him. (R. at 348.) Therefore, he recommended transitioning him into a work hardening/conditioning program. (R. at 348.)

Ascue presented to Park Avenue Physical Therapy on January 23, 2009, for an initial evaluation. (R. at 597-98.) He complained of pain in the right hip and pelvic region and an intolerance to pressure on the anterior knee to kneel. (R. at 597.) Ascue's gait was moderately antalgic with decreased right knee extension, and he had difficulty squatting. (R. at 597-98.) When carrying weights, Ascue had difficulty shifting weight onto the right leg. (R. at 598.) Active right knee range of motion was limited to approximately 15 degrees from full extension, and passive

-14-

range of motion was limited to approximately 5 degrees. (R. at 598.) Right hip range of motion was palpably stiff, and Ascue had 4/5 strength in the right hip and knee. (R. at 598.) It was determined that work hardening would likely be beneficial to Ascue. (R. at 598.) By February 10, 2009, Ascue had attended six sessions of work conditioning half-days. (R. at 599.) He reported some pain relief in his right hip and low back pain, but increased stiffness. (R. at 599.) Right hip strength had improved since the initial evaluation, and right knee strength was unchanged in the hamstrings, but slightly increased in the quadriceps. (R. at 599.) Range of motion of the left hip was palpably less stiff, but pain with external rotation had increased. (R. at 599.) Palpation also revealed increased fullness over the right lumbosacral/gluteal region with significant tenderness over the right SI joint and iliac crest. (R. at 599.) Functionally, Ascue was performing stair climbing with less difficulty, but squatting and lifting remained unchanged from the initial evaluation. (R. at 599.) Mari Knettle, PT, opined that Ascue may benefit from continued half-day work conditioning sessions for continued improved function. (R. at 599.) She noted that his symptoms had been consistent in subjective report and overall observation with some type of injury/strain in the right lumbosacral region in addition to the above diagnoses. (R. at 599.) These complaints had shown some improvement, but had not been alleviated. (R. at 599.)

When Ascue saw Dr. Miller on February 10, 2009, he noted the physical therapist's opinion that Ascue was making some progress. (R. at 347.) However, he noted that Ascue was "quite limited" by his hip and back pain, stating that Ascue was reporting pain along the posterior aspect of his lower back and right buttock and groin region, present for the previous two months. (R. at 347.) On physical examination, the knee was quite stable to stressing, but quad strength

-15-

remained 4/5. (R. at 347.) Knee flexor strength was improving at about 4+/5, and the tibia was in good alignment with no signs of infection. (R. at 347.) Ascue had a mildly positive straight leg raise, as well as a very tight gastroc soleus complex. (R. at 347.) Dr. Miller diagnosed worsening right back pain symptomatology, for which he ordered an MRI. (R. at 347.) Ascue continued with physical therapy at Park Avenue through March 16, 2009, and his complaints of severe right ankle pain persisted. (R. at 600-01.)

An MRI of the lumbar spine dated February 23, 2009, showed diffuse disc bulge and left paracentral disc protrusion at the L5-S1 level with no spinal canal stenosis. (R. at 368.)

When Ascue returned to Dr. Miller on March 18, 2009, he reported worsening right leg pain and a severe, stabbing type pain proximal to his ankle, in addition to continued back pain. (R. at 346.) Physical examination revealed no joint effusion of the knee with a full range of motion. (R. at 346.) He had point tenderness to deep palpation proximal to the ankle joint over the anterolateral aspect, corresponding to his distal interlocking screws. (R. at 346.) Ascue remained grossly neurologically intact in the right leg with no significant neurovascular deficits. (R. at 346.) His back examination revealed right-sided paraspinal muscular spasms and tightness. (R. at 346.) Dr. Miller diagnosed right lower extremity hardware pain, corresponding to distal interlocking screws, and a disc bulge at the L5-S1 level of the spine. (R. at 346.) He recommended a referral to an orthopaedist or neurosurgeon for a back examination for further treatment. (R. at 346.) He further recommended removal of the screws, to which Ascue agreed. (R. at 346.)

-16-

On April 24, 2009, Dr. Miller performed a prominent hardware removal of three screws from Ascue's right ankle, which were causing pain. (R. at 359.) When Ascue saw Dr. Miller on May 6, 2009, for a surgical follow-up, he was bearing full weight on the right lower extremity, and he was encouraged to continue a home exercise program. (R. at 344.) On June 17, 2009, Ascue returned to Dr. Miller, who noted that he still had not seen a specialist for his back. (R. at 343.) Physical examination showed no joint effusion, a good range of motion of the knee, good quad strength, a normal foot and ankle exam and full strength in the EHL, tibialis anterior, gastroc soleus, quadriceps, hamstrings and iliopsoas. (R. at 343.) Deep tendon reflexes were 2+ and symmetrical, and there was no clonus. (R. at 343.) Ascue did have positive straight leg raise testing throughout the lower extremity in both the sitting and supine position. (R. at 343.) Dr. Miller diagnosed persistent radicular leg symptomatology. (R. at 343.) He reported that he could not place Ascue at maximum medical improvement because his radicular leg symptomatology was interfering with his examination and determination of his permanent impairment. (R. at 343.) He opined that a functional capacity evaluation also would be premature. (R. at 343.)

On December 16, 2009, Dr. Miller noted that Ascue had seen Dr. Jewell[7] for a spinal evaluation. (R. at 342.) Ascue complained of increased radicular type leg pain, which ran down the back of both legs, as well as occasional numbness/tingling and pain. (R. at 342.) On physical examination, Ascue had positive straight leg raise testing in both the sitting and supine positions. (R. at 342.) He was neurovascularly intact with good quad and hip flexor strength. (R. at

---

[7] Dr. Jewell's full name is not contained in the record, nor are the treatment notes from this evaluation.

342.) Dr. Miller diagnosed persistent nerve root tension signs of both legs. (R. at 342.) He recommended to proceed with an electromyogram, ("EMG"), and nerve conduction study, ("NCS"), to determine whether there was any compression of the nerve roots. (R. at 342.) He did not recommend that Ascue return to any type of work at that time. (R. at 342.) Dr. Miller wrote a note stating that Ascue's return to work was uncertain, but he was not to do so at least until after undergoing the NCS. (R. at 505.)

On February 10, 2010, Ascue presented to Dr. Michael B. Ford, M.D., with complaints of back and knee pain. (R. at 459.) He was diagnosed with bulging discs in the lumbar spine, and an EMG and NCS were recommended. (R. at 459.) On August 2, 2010, Ascue returned to Dr. Ford with complaints of left knee pain and gastroesophageal reflux disease, ("GERD"). (R. at 455.) He was prescribed Prilosec. (R. at 455.) On September 1, 2010, Ascue reported that Prilosec helped his stomach, but that his left knee was "bothersome." (R. at 453.) Physical examination again was unremarkable. (R. at 453.) On November 4, 2010, Ascue wanted to discuss a milder alternative to Klonopin. (R. at 452.) He was diagnosed with panic attacks and continued on Klonopin. (R. at 452.) On January 24, 2011, Ascue complained of numbness and tingling with an occasional loss of grip. (R. at 451.) He also noted increased pain from his elbows to fingers in both arms. (R. at 451.) Nonetheless, Ascue reported that Mobic helped. (R. at 451.) He was diagnosed with post-traumatic stress; depressive symptoms; and severe panic attacks. (R. at 451.)

Dr. Miller wrote a "To Whom It May Concern" letter, dated March 3, 2010, stating that he had treated Ascue since the March 20, 2008, injury. (R. at 502-04.)

He opined that Ascue's back problems were likely related to this injury and that he was not at maximum medical improvement and should not be released to work. (R. at 503.) He further opined that Ascue had been temporarily totally disabled since that time and would remain so indefinitely. (R. at 503.) Dr. Miller opined that Ascue needed an EMG/NCS and a neurosurgical evaluation, both of which had been ordered, but which either had never been approved or not responded to by the workers' compensation carrier. (R. at 503.) Dr. Miller stated that he was ordering a referral for Ascue to see Dr. Rebekah Austin, M.D., of Blue Ridge Neuroscience Center, for evaluation and treatment of his work-related injuries, including right buttock, right hip and right leg radicular type pain. (R. at 504.) He found it impossible to place Ascue at maximal medical improvement with regard to his right leg trauma at that time because the radicular leg symptomatology was interfering with his examination and determination of his permanent impairment. (R. at 504.) In particular, Dr. Miller opined that Ascue's radicular leg pain was affecting both the strength and motion of the right leg and would negatively affect the determination of his actual impairment. (R. at 504.) Dr. Miller found it imperative that Ascue be evaluated by a spine specialist, particularly in regard to the disc bulge and disc protrusion at the L5-S1 level. (R. at 504.)

On August 31, 2010, Ascue saw Dr. William Humphries, M.D., for a consultative physical evaluation at the request of the Virginia Department of Rehabilitative Services. (R. at 421-25.) He was alert, pleasant and in mild distress due to back discomfort. (R. at 422.) Ascue related adequately to Dr. Humphries, was cooperative and was oriented with intelligible and sustained speech with no aphasia. (R. at 422.) Thought content was within normal range, as was memory for recent and remote events. (R. at 422.) Intelligence was within normal range, and

-19-

affect was appropriate. (R. at 422.) Ascue had a mildly reduced range of motion of the neck without tenderness, and back range of motion was moderately reduced. (R. at 422.) There was tenderness to palpation of the paraspinous muscles of the lower thoracic and entire lumbar region with no scoliosis or paravertebral muscle spasm. (R. at 422.) Straight leg raise testing was negative to 80 degrees sitting, and joint range of motion of the upper extremities was slightly reduced in both shoulders. (R. at 423.) Lower extremity joint range of motion was reduced in both hips and both knees, but was within normal limits in the left ankle and slightly reduced in the right ankle. (R. at 423.) There was moderate synovial thickening of some of the IP joints. (R. at 423.) Grip was 5/5, and radial, median and ulnar nerve functions were intact. (R. at 423.) Ascue's gait was mildly antalgic on the right, he was able to heel and toe stand, and tandem gait was performed adequately with occasional miscue. (R. at 423.) Strength was within normal limits in both lower extremities, and calves were equal in circumference. (R. at 423.) However, Dr. Humphries noted an approximate three centimeter circumference loss of the right thigh as compared to the left. (R. at 423.) Deep tendon reflexes were trace to 1+ and equal in both upper extremities and 2+ and equal in the knees, deferred in the right ankle and 2+ in the left ankle. (R. at 423.) There was mild sensory loss to light touch of the right lateral calf as compared to the left. (R. at 423.) The lower extremities revealed no significant venous stasis changes, and foot perfusion was adequate. (R. at 424.)

Dr. Humphries diagnosed Ascue with post-traumatic degenerative joint disease of the right knee and right ankle; and post-traumatic lumbar strain, cannot rule out degenerative joint disease versus degenerative disc disease, post-traumatic. (R. at 424.) He opined that Ascue could sit six hours in an eight-hour workday,

stand and walk two hours in an eight-hour workday and lift items weighing up to 25 pounds occasionally and up to 10 pounds frequently. (R. at 424.) He further opined that Ascue could occasionally climb and kneel, but never crawl. (R. at 424.) He placed no limitations on his ability to stoop or crouch, but he opined that he should avoid heights and hazards. (R. at 424.)

On September 7, 2010, Dr. Gurcharan Singh, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, finding that Ascue could perform light work that required no more than occasional climbing of ladders, ropes or scaffolds. (R. at 427-33.) He did not place any manipulative, visual, communicative or environmental limitations on Ascue. (R. at 430-31.)

Ascue saw B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, on December 16, 2010, for a psychological evaluation due to extreme anxiety and possible PTSD. (R. at 612-16.) Ascue admitted to having used illicit drugs intravenously in the past. (R. at 613.) He stated that he took Klonopin rarely, as it made him rather drowsy. (R. at 613.) He denied having received any formal psychiatric or psychotherapeutic intervention. (R. at 613.) On mental status examination, Ascue exhibited no signs of ongoing psychotic processes or delusional thinking. (R. at 613.) He reported a fluctuating mood, but denied suicidal or homicidal ideation, plan or intent. (R. at 613-14.) He described a typical day as "piddling around" and stated that he did his own laundry, cooking, cleaning and grocery shopping. (R. at 614.) He reported occasionally dating, and he stated that he socialized with friends and watched some television. (R. at 614.) He reported experiencing panic attacks every other day, during which his face would

go numb, he had difficulty breathing, and he would occasionally become dizzy. (R. at 614.) Ascue stated these attacks lasted from a relatively brief period of time to more than an hour. (R. at 614.)

Lanthorn administered the Personality Assessment Inventory, ("PAI"), which indicated moderate distress, a high degree of anxiety, the presence of depression, discouragement and social withdrawal. (R. at 614.) Test results indicated that Ascue's thought processes were likely to be marked by confusion, distractibility and difficulty concentrating. (R. at 614-15.) In addition, the PAI indicated that Ascue was experiencing significant anxiety related to disturbing and traumatic past events, including his incarceration and his work accident. (R. at 615.) Lanthorn diagnosed Ascue with major depressive disorder, single episode, moderate; panic disorder without agoraphobia; PTSD; somatization disorder, not otherwise specified; and opiate dependence in sustained full remission; and he placed his then-current Global Assessment of Functioning, ("GAF"),[8] score at 55 to 60.[9] (R. at 615.) Lanthorn concluded that Ascue's prognosis was between fair and guarded, and he recommended that he receive mental health intervention. (R. at 615.)

On January 25, 2011, Dr. Ford completed an Assessment Of Ability To Do Work-Related Activities (Physical) of Ascue, finding that he could lift and/or carry

---

[8] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[9] A GAF score of 51 to 60 indicates "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. …" DSM-IV at 32.

items weighing up to five pounds occasionally and up to 10 pounds frequently. (R. at 473-75.) He found that Ascue could stand and/or walk a total of less than two hours in an eight-hour workday, but could do so for 15 minutes without interruption. (R. at 473.) Likewise, Dr. Ford found that Ascue could sit for a total of less than two hours in an eight-hour workday, but could do so for only 15 to 20 minutes without interruption. (R. at 474.) Dr. Ford further opined that Ascue could occasionally stoop and balance, but never climb, kneel, crouch or crawl. (R. at 424.) He found that his abilities to reach, to handle, to feel and to push/pull were affected by his impairment and that he should not work around heights, moving machinery, noise, extreme cold, fumes, humidity or vibration, as these things would affect his back pain and anxiety with resulting distraction and inability to concentrate. (R. at 474-75.) Dr. Ford added that physically demanding work was not an option for Ascue due to pain and complications from his work injury. (R. at 475.) He further noted that Ascue suffered from panic attacks that affected his ability to interact with others and to sustain gainful employment. (R. at 475.) Dr. Ford concluded that Ascue would miss more than two workdays monthly. (R. at 475.)

Dr. Ford also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) on this date, finding that Ascue had a seriously limited ability to maintain personal appearance and no useful ability to function in all other areas of making occupational, performance and personal/social adjustments. (R. at 476-78.) Dr. Ford based these conclusions on Ascue's panic attacks, loss of concentration and easy distractibility, as well as his need to reposition frequently if sitting or standing and inability to tolerate walking for any length of time. (R. at 476.) Dr. Ford noted that Ascue's difficulty concentrating and panic attacks would

result in difficulty interacting with others. (R. at 477.) He opined that Ascue would be absent, on average, more than two workdays monthly due to his impairments or treatment. (R. at 478.)

On March 14, 2011, Ascue saw Mary Elizabeth Ballard, M.A., a senior psychological examiner, for a psychological evaluation at the request of the State Agency. (R. at 479-84.) Ascue exhibited a somewhat flat affect with a depressed mood, but his speech and behavior were appropriate throughout the interview. (R. at 479.) He exhibited an adequate degree of cooperation and appeared motivated to provide accurate information. (R. at 479.) Ascue reported last using illicit drugs six years previously. (R. at 480.) He was incarcerated for Methadone distribution in 2005 for three years. (R. at 480.) Ascue reported that he had always gotten along well with colleagues and supervisors. (R. at 481.) On mental status examination, his affect generally was flat. (R. at 481.) He reported that he did not have much of a memory since the accident. (R. at 481.) He made adequate eye contact and exhibited an adequate degree of concentration and attention and followed all directions asked of him. (R. at 481.) There was no psychomotor agitation or retardation noted, and he was able to recall three out of three items on immediate recall, but was unable to recall any on second recall. (R. at 481.) Ascue was unable to perform serial sevens or serial threes. (R. at 481.) His speech was logical, coherent and goal-directed throughout the evaluation, and there was no indication of a psychotic thought disorder. (R. at 481.) Ascue appeared to have adequate insight and judgment. (R. at 481-82.)

Ballard estimated that Ascue was functioning in the low average to average range of intelligence. (R. at 482.) Ascue reported increased depression since his

-24-

work accident, self-isolation and lack of energy and motivation. (R. at 482.) He reported becoming easily irritated, nightmares that would "come and go" and a fear of getting back on a forklift. (R. at 482.) Ascue denied any then-current or past suicidal thoughts or gestures. (R. at 482.) He stated that he had panic attacks with no precipitating factors, which made him want to "run to the hospital" because he felt like he was dying. (R. at 482.) These attacks lasted approximately a day, off and on. (R. at 482.)

Ascue reported that he got up between 8:00 and 10:00 a.m. and had breakfast. (R. at 482.) If he had a panic attack, he would go back to bed and stay there until dinner. (R. at 482.) Otherwise, he would read or watch television. (R. at 482.) He would go outside, clean his home and visit with friends. (R. at 482.) Ascue stated that he did not cook, but ate fast food, and he did not perform yard work, shop or attend church services. (R. at 482.) He stated that he could travel alone "on a good day." (R. at 482.) He rated his ability to perform activities of daily living adequate. (R. at 482.) Ascue stated that he did "nothing" for fun. (R. at 482.) Ballard found that Ascue had the ability to relate to others, but was mildly limiting himself due to his panic attacks. (R. at 483.) She noted that no testing was requested. (R. at 483.)

Ballard diagnosed dysthymic disorder; and panic disorder without agoraphobia; and she assessed Ascue's then-current GAF score at 54. (R. at 483.) She concluded that he could understand and remember simple instructions and was only mildly limited in his ability to understand and remember detailed instructions due to symptoms of depression and anxiety. (R. at 484.) Ballard further found Ascue's ability to sustain concentration and persistence to be adequate and to make

-25-

simple work-related decisions, as well as to work in coordination with and/or in proximity to others without being distracted by them, was moderately limited due to symptoms of panic disorder. (R. at 484.) She found that Ascue had the ability to maintain age-appropriate social behavior and the basic standards of neatness and cleanliness, although he was then-currently isolating himself from others. (R. at 484.) She found that he did have the ability to respond appropriately to changes in the work setting and to be aware of normal hazards and take precautions. (R. at 484.) Diane L. Whitehead, Ph.D., a licensed clinical psychologist, also signed the evaluation. (R. at 484.)

On March 25, 2011, Ascue saw Dr. Kevin Blackwell, D.O., for a consultative physical evaluation at the request of the State Agency. (R. at 487-91.) Ascue reported constant pain, worsened by activity. (R. at 487.) He rated his typical pain level as 3-5/10, and 10/10 on a bad day. (R. at 487.) Ascue stated that he was then-currently taking Prilosec, Klonopin and Hydrocodone. (R. at 487.) He did not appear to be in any acute distress, he was alert, cooperative and fully oriented with good mental status. (R. at 488.) There was no cyanosis or edema of the extremities, and his gait was symmetrical and balanced, but he had an absent reflex in the right patella, which Dr. Blackwell opined was likely the result of surgery. (R. at 489.) Otherwise, reflexes were intact throughout. (R. at 489.) Ascue's back had some tenderness in the lumbar region, but the remainder of joints were normal. (R. at 489.) Grip strength was good, and fine motor movement and skill activities of the hands were normal. (R. at 489.) Dr. Blackwell diagnosed persistent back pain; right foot/leg pain; history of ACL repair; and history of anxiety. (R. at 489.)

Dr. Blackwell concluded that Ascue could sit for eight hours in an eight-hour workday, stand for two hours with normal positional changes, operate a vehicle two-thirds of the day and bend at the waist and kneel one-third of the day. (R. at 489.) He should avoid squatting, stooping, crouching, crawling and working at unprotected heights. (R. at 489.) He could perform above-head reaching activities one-third of the day with either arm, and operate foot pedals with either foot one-third of the day. (R. at 489.) Dr. Blackwell imposed no limitations on Ascue's hand usage, including fine motor movement skills. (R. at 489.) He opined that he could lift items weighing up to 40 pounds occasionally and up to 20 pounds frequently. (R. at 489-90.) He imposed no visual, communicative, auditory or environmental limitations. (R. at 490.) Dr. Blackwell found that Ascue provided a history that appeared reasonably reliable and was consistent throughout the examination. (R. at 490.) He concluded that, within a reasonable degree of medical probability, Ascue was at maximal medical improvement, and he would not anticipate a significant change in limitations over the coming 12 months. (R. at 490.)

On April 5, 2011, Dr. Michael Hartman, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, finding that Ascue could occasionally lift and/or carry items weighing up to 20 pounds and frequently lift and/or carry items weighing up to 10 pounds. (R. at 69-71.) Dr. Hartman further found that Ascue could stand and/or walk for a total of about six hours in an eight-hour workday and sit for about six hours in an eight-hour workday. (R. at 70.) Dr. Hartman based these limitations on Ascue's degenerative disc disease, history of right tibia fracture, history of right knee arthroscopy and ACL reconstruction. (R. at 70.) He found that Ascue could frequently balance,

-27-

occasionally climb ramps and stairs, stoop, kneel, crouch and crawl, but never climb ladders, ropes or scaffolds. (R. at 70.) Dr. Hartman imposed no manipulative, visual or communicative limitations. (R. at 70-71.) He opined that Ascue should avoid concentrated exposure to hazards, such as machinery and heights. (R. at 71.) Dr. Hartman concluded that, despite Ascue's pain in his back, feet, hips, ACL, joints and muscles, it did not significantly limit his ability to stand, walk and move about within normal limits. (R. at 75.) He concluded that Ascue's condition precluded him from performing past work, but did not preclude him from performing less demanding work. (R. at 75.)

On April 8, 2011, Louis Perrott, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding that Ascue was mildly restricted in his activities of daily living, experienced moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 67-68.) Perrott also completed a Mental Residual Functional Capacity Assessment, finding that Ascue was moderately limited in his ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to work in coordination with or in proximity to others without being distracted by them, to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes and to respond

appropriately to changes in the work setting. (R. at 71-73.) Perrott opined that Ascue could follow one- to two-step instructions, complete simple work tasks, interact adequately with other people, adjust to ordinary changes, complete an average workweek, follow work rules and maintain safety. (R. at 73.) He concluded that Ascue could perform simple, routine, nonstressful work requiring minimal social interaction. (R. at 73.)

When Ascue saw Dr. Ford on May 4, 2011, he requested a medication change from Prilosec to Nexium. (R. at 652.) Physical examination showed no atrophy or weakness, a normal gait, no deformity, clubbing, cyanosis or edema of the extremities, and deep tendon reflexes were symmetric. (R. at 652.) Ascue was alert and oriented with a normal mood. (R. at 652.) Dr. Ford diagnosed GERD and anxiety and prescribed Nexium. (R. at 652.)

Ascue presented to Norton Community Hospital on July 18, 2011, with complaints of intermittent, right-sided abdominal and lower back pain for the previous few days, associated with nausea and diarrhea. (R. at 621-37.) He was given a Toradol injection. (R. at 625.) A CT scane of the abdomen and pelvis showed mild bilateral, nonobstructing nephrolithiasis[10] with no evidence of hydronephrosis[11] or ureteral stone on either side. (R. at 627, 633, 637.) No acute radiographic abnormality was noted. (R. at 627, 633, 637.) Ascue was discharged

---

[10] Nephrolithiasis refers to a condition marked by the presence of renal calculi, or kidney stones. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1107 (27th ed. 1988).

[11] Hydronephrosis refers to a distention of the pelvis and calices of the kidney with urine as a result of obstruction of the ureter with accompanying atrophy of the parenchyma of the organ. *See* Dorland's at 785.

home the same day with the pain basically resolved. (R. at 629.) He was prescribed Carafate and Zantac and was advised to follow up with Dr. D'Amato.[12] (R. at 631.)

On July 21, 2011, Lanthorn completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) of Ascue, finding that he had a more than satisfactory ability to understand, remember and carry out simple job instructions, a limited, but satisfactory, ability to follow work rules, to relate to co-workers, to interact with supervisors, to function independently, to maintain attention/concentration, to understand, remember and carry out detailed job instructions and to maintain personal appearance and a seriously limited ability to deal with the public, to use judgment, to deal with work stresses, to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 617-19.) Lanthorn based these findings on Ascue's diagnoses of major depressive disorder, single episode, moderate; panic disorder without agoraphobia; rule out PTSD; rule out somatization disorder, not otherwise specified; and opiate dependence in sustained full remission. (R. at 617.) He referred to the narrative summary contained in the December 2010 evaluation for a description of other work-related activities affected by Ascue's impairments and for the medical/clinical findings in support of the assessment. (R. at 619.) Lanthorn stated that Ascue's average absences from work due to his impairments and treatment were "unclear at the present." (R. at 619.)

When Ascue returned to Dr. Ford on July 25, 2011, a musculoskeletal and

---

[12] Dr. D'Amato's full name is not contained in the record, and no treatment notes from Dr. D'Amato have been provided to the court.

extremity examination were normal. (R. at 651.) Ascue noted a red, raised painful area underneath his left arm for the previous three or four days. (R. at 651.) Dr. Ford diagnosed cellulitis, and he drained the abscess. (R. at 650-51.) On October 5, 2011, Ascue complained of continued back pain, but stated that Lortab covered his pain "fairly well." (R. at 647.) Musculoskeletal and extremity examinations again were normal. (R. at 647.) Dr. Ford diagnosed osteoarthritis, GERD and anxiety, and he prescribed Lortab. (R. at 647-48.) On November 28, 2011, Ascue reported that his stomach was "much better." (R. at 646.) He stated that he had stopped taking Nexium and Mobic, and wished to discuss his Lortab dosage. (R. at 647.) Dr. Ford decreased the Nexium to an as needed basis. (R. at 647.)

On January 18, 2012, Ascue reported to Dr. Ford that he was doing "much better" with his present pain medication, that his stomach problems were almost completely resolved and that he did not feel as anxious. (R. at 644.) Dr. Ford indicated that Ascue appeared much more focused and was more animated, was dwelling less on his health problems and was excited with his present pain management regimen and relief status. (R. at 644.) He diagnosed osteoarthritis, GERD and chronic pain, and he instructed Ascue to continue his medications as ordered. (R. at 644-45.) On March 7, 2012, Ascue reported that Klonopin oversedated him, but that his pain prescription helped. (R. at 643.) Dr. Ford again diagnosed osteoarthritis, GERD and chronic pain. (R. at 643.)

On August 20, 2012, Ascue was referred to the emergency department at Clinch Valley Medical Center for evaluation of a suspected bleeding tendency after he developed substantial bleeding from the right nostril, lasting approximately 15 minutes. (R. at 657-58.) He admitted to occasional migraines of pressure type

-31-

primarily in the frontal area, but denied any neurological symptoms, including syncope. (R. at 657.) Ascue's right knee appeared slightly deformed, but was functional. (R. at 657.) Muscles showed good tone, and Ascue had no features of motor or sensory deficits, cerebellar or meningeal signs. (R. at 657.) A local lesion in the right naris was deemed responsible for the bleeding. (R. at 656.) Ascue was discharged, but returned shortly afterwards complaining that bleeding had resumed. (R. at 656.) He received a dose of desmopressin to control the bleeding on a more permanent basis and discharged with instructions to proceed to the nearest emergency room for cauterization of the lesion in his nose should the bleeding recur. (R. at 656.) Ascue was diagnosed with moderate thrombocytopenia, possibly related to previous effect of viral infection; epistaxis, related to probable vascular anomaly; traumatic injury to the right knee; and mild chronic anxiety state. (R. at 656.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2014); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2014).

-32-

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(c), if he sufficiently explains his rationale and if the record supports his findings.

Ascue argues that the ALJ erred by improperly determining both his physical and mental residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7.) More specifically, Ascue argues that the ALJ erred by giving too little weight to the opinions of Drs. Miller and Ford, his treating orthopaedist and treating physician, respectively. (Plaintiff's Brief at 7.) He also argues that the ALJ erred by stating

-33-

that he was giving great weight to consultative psychologist Lanthorn's opinion, while clearly failing to accept Lanthorn's finding that he had only a "fair" ability, resulting in an unsatisfactory work performance, to perform several work-related mental abilities.  (Plaintiff's Brief at 7.)

After a review of the evidence of record, I find Ascue's arguments unpersuasive. The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain v. Schweiker*, 715 F.2d 866, 869 (4th Cir. 1983). The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. § 404.1527(c)(2) (2014). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)).  In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight."  *Craig*, 76 F.3d at 590.

Based on my review of the record, I find that substantial evidence exists to support the ALJ's weighing of both the physical and psychological evidence of record.  First, I find that substantial evidence supports the ALJ's decision to give little weight to the opinion of Dr. Miller. Dr. Miller has been Ascue's treating orthopaedist since he suffered the work injury in March 2008. Dr. Miller surgically repaired Ascue's right tibia fracture in March 2008, performed a right ACL reconstruction in September 2008 and removed hardware from his right ankle in

April 2009.  In a letter dated March 3, 2010, Dr. Miller opined that Ascue was not at maximum medical improvement and should not be released to work.  He further opined that Ascue had been, and would indefinitely remain, temporarily totally disabled from the date of his injury. However, Dr. Miller also found that it was not possible to place Ascue at maximum medical improvement regarding his right leg trauma at that time because his radicular leg symptomatology interfered with his examination and the determination of his permanent impairment. More specifically, Dr. Miller opined that Ascue needed a referral to a neurosurgeon for spinal evaluation related to his disc bulge and disc protrusion at the L5-S1 level, as this was affecting the strength and motion of his right leg. Thus, while Dr. Miller opined that Ascue was not at maximum medical improvement, would remain so indefinitely, was temporarily totally disabled and should not return to work as of March 3, 2010, this was a "conditional" opinion, as Dr. Miller explicitly stated that such a determination of permanent impairment could be made only after evaluation by a spinal specialist who could determine the effect of Ascue's back impairment on his right leg functioning.  For this reason alone, I find that substantial evidence supports the ALJ's decision to give this opinion little weight. However, I further find that Dr. Miller's own treatment notes do not support a finding of disability.

At the time Dr. Miller wrote this letter, he had performed the three surgical procedures mentioned above.  After undergoing these surgical procedures, the last of which was in April 2009, Ascue's right leg condition improved. On May 6, 2009, just a couple of weeks following the removal of hardware from Ascue's ankle, Dr. Miller noted that Ascue was bearing full weight on the right lower extremity.  In June 2009, a physical exam was largely unremarkable with no joint effusion, good knee range of motion, good quad strength, a normal foot and ankle

-35-

exam and full strength in the lower extremities. Ascue did exhibit positive straight leg raise testing throughout the lower extremities. In December 2009, Ascue again had positive straight leg raise testing, but he was neurovascularly intact with good quad and hip flexor strength.

At best, I find that Dr. Miller's opinion is inconclusive and, at worst, it is inconsistent with his own treatment notes. Given this, I find that the ALJ properly accorded little weight thereto.

The ALJ stated that he was giving the opinion of Dr. Ford, Ascue's treating physician, little weight because it was inconsistent with his own clinical findings and failed to correlate functionally with other clinical findings in the record. I find that this determination also is supported by substantial evidence. Dr. Ford treated Ascue from February 2010 through March 2012. On January 25, 2011, Dr. Ford completed a physical assessment of Ascue's work-related abilities, in which he opined that Ascue could lift/carry items weighing up to five pounds occasionally and up to 10 pounds frequently, stand and/or walk less than two hours in an eight-hour workday, but for 15 minutes without interruption, and sit for less than two hours in an eight-hour workday, but for 15 to 20 minutes without interruption. He also opined Ascue could occasionally stoop and balance, but never climb, kneel, crouch or crawl and that his abilities to reach, to handle, to feel and to push/pull were affected by his impairments. Dr. Ford opined that Ascue should not work around heights, moving machinery, noise, extreme cold, fumes, humidity or vibration. He concluded that physically demanding work was not an option for Ascue, that panic attacks would affect his ability to interact with others and that he would miss more than two workdays monthly. The court first notes that Dr. Ford's

finding that Ascue could lift/carry more weight frequently than he could lift/carry occasionally is simply illogical and calls into doubt the credibility of his assessment. Aside from this, however, as the ALJ stated in his decision, such severe restrictions are inconsistent with Dr. Ford's own treatment notes of Ascue.

For instance, at the time Dr. Ford completed this assessment, he had seen Ascue on only a handful of occasions. In February 2010, Ascue complained of back and knee pain. He had positive bilateral straight leg raise testing and was diagnosed with bulging discs at the L5-S1 level of the spine and old knee surgery on the right with resulting chronic pain. Dr. Ford ordered diagnostic testing and prescribed Lortab. In August 2010, Ascue complained of left knee pain and GERD, but a physical examination was unremarkable. In September 2010, he reported that Prilosec had helped his symptoms of GERD, and a physical examination again was unremarkable, despite Ascue's report that his left knee was "bothersome." In January 2011, Ascue reported numbness and tingling with associated loss of hand grip and pain from the elbows to the fingers in both upper extremities. Dr. Ford did not perform a physical examination, but Ascue indicated that Mobic helped his symptoms. These are the only office visits that Ascue had with Dr. Ford before he imposed the severe limitations contained in the January 25, 2011, assessment. Thus, they clearly are not supported by Dr. Ford's own treatment notes prior to that time. Additionally, Dr. Ford's treatment notes after that time also do not support such restrictions. For example, physical examinations in May, July and October 2011, were normal. In October 2011, despite Ascue's complaints of back pain, he reported that Lortab covered it "fairly well," reducing it from a 9/10 to a 3-4/10. In November 2011, Ascue reported that he had stopped taking Mobic. In January 2012, Ascue stated that he was doing "much better," and Dr. Ford noted that Ascue

-37-

was excited with his present pain management regimen and relief status. In March 2012, he stated that his pain prescription helped. Over the period that Dr. Ford treated Ascue, he never placed any restrictions on Ascue's physical activities. He treated Ascue's impairments conservatively with medications, which Ascue admitted helped his symptoms. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

Additionally, Dr. Ford's harsh limitations are not supported by the other clinical evidence of record. For instance, following the hardware removal in April 2009, Ascue was bearing full weight by May 6, 2009. In June 2009, physical examination was essentially normal with the exception of positive straight leg raising. He again exhibited positive straight leg raise testing on December 6, 2009, but was neurovascularly intact with good quad and hip flexor strength. In August 2010, Dr. Humphries, after conducting a physical examination of Ascue, concluded that he could sit six hours in an eight-hour workday, stand and walk two hours in an eight-hour workday, lift items weighing up to 25 pounds occasionally and up to 10 pounds frequently and occasionally climb and kneel, but never crawl. Dr. Humphries placed no limitations on his ability to stoop or crouch, but he opined that Ascue should avoid heights and hazards. In September 2010, Dr. Singh, a state agency physician, opined that Ascue could perform light work that required no more than occasional climbing of ladders, ropes or scaffolds.

In March 2011, Dr. Blackwell, another consultative examiner, opined, after conducting a physical examination of Ascue, that he could sit for eight hours in an eight-hour workday, stand for two hours in an eight-hour workday with normal

positional changes, lift items weighing up to 40 pounds occasionally and up to 20 pounds frequently, bend at the waist and kneel one-third of the day and perform above-head reaching activities and operate foot pedals one-third of the day, but he opined that Ascue should avoid squatting, stooping, crouching, crawling and working at unprotected heights. In April 2011, Dr. Hartman, a state agency physician, concluded, after reviewing the medical evidence, that Ascue could lift and/or carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently, stand and/or walk six hours in an eight-hour workday and sit for about six hours in an eight-hour workday. He opined that Ascue could frequently balance, occasionally climb ramps and stairs, stoop, kneel, crouch and crawl, but never climb ladders, ropes or scaffolds. Dr. Hartman opined that Ascue should avoid concentrated exposure to hazards, such as machinery and heights. He concluded that Ascue's condition did not preclude him from performing work that was less demanding than his past work.

Lastly, Ascue's own descriptions of his activities of daily living do not support Dr. Ford's assessment. Specifically, Ascue informed Lanthorn in December 2010 that, on a typical day, he "piddl[ed] around," did his own laundry, cooked, cleaned and grocery shopped. He also reported occasionally dating, socializing with friends and watching television. In March 2011, he reported reading, watching television, going outside, cleaning his home, visiting with friends and traveling on a "good day." At that time, he rated his ability to perform activities of daily living as adequate.

It is for all of these reasons that I find that substantial evidence supports the ALJ's decision to accord little weight to Dr. Ford's opinion. For the reasons that

follow, I also find that substantial evidence supports the ALJ's decision with regard to the weighing of the psychological evidence.

The ALJ stated in his decision that he was giving great weight to the opinions of psychologists Lanthorn, Whitehead/Ballard and Perrott. Ascue argues that Lanthorn opined that he had a "fair" ability, defined as resulting in an unsatisfactory work performance, in nearly half of the abilities evaluated, but that the ALJ clearly did not consider this when giving his opinion great weight. I agree that the ALJ did not specify this finding of Lanthorn's, but, even assuming that this was in error, I find that the ultimate disability determination did not rise or fall on Lanthorn's opinion. Instead, I find that the ALJ's decision to give great weight to the opinions of Whitehead/Ballard and Perrott is supported by substantial evidence, as is the resulting mental residual functional capacity finding.

Whitehead and Ballard opined in March 2011 that Ascue could understand and remember simple instructions and was only mildly limited in his ability to understand and remember detailed instructions. They further found that his ability to sustain concentration and persistence was adequate and that he was moderately limited in his ability to make simple work decisions and to work in coordination with and/or in proximity to others without being distracted by them. Whitehead and Ballard opined that Ascue could maintain age-appropriate social behavior and basic standards of neatness and cleanliness. They found he also had the ability to respond appropriately to changes in the work setting and be aware of normal hazards and take precautions. In April 2011, state agency psychologist Perrott opined that Ascue was only mildly restricted in his activities of daily living, experienced moderate difficulties maintaining social functioning and maintaining

concentration, persistence or pace and had experienced no repeated episodes of decompensation, each of extended duration. Perrott further opined that, despite having some moderate limitations, Ascue could perform simple, routine, nonstressful work requiring minimal social interaction.

I find that these opinions are supported by the other substantial evidence of record. I first note that the first mention in the record of any type of treatment for mental health issues was in 2010, when Dr. Ford treated Ascue conservatively with medication. Over his course of treatment of Ascue, Dr. Ford imposed no work-related mental restrictions, nor did he refer him for psychiatric treatment or counseling. Furthermore, Ascue admitted to Lanthorn that he had never received any such treatment in the past, and it is clear that Ascue saw Lanthorn at his attorney's referral for the purpose of gathering evidence for his disability claim, not for treatment. Additionally, when Ascue saw Dr. Humphries in August 2010, he was alert, pleasant and cooperative, and he was oriented with intelligible speech. Thought content was within normal range, as was memory for recent and remote events. Ascue's affect was appropriate. When Ascue saw Dr. Blackwell in March 2011, he was alert, cooperative and fully oriented with good mental status. On May 4, 2011, Dr. Ford noted that Ascue was alert and oriented with a normal mood. In January 2012, Dr. Ford indicated that Ascue did not feel as anxious and that he appeared more focused and more animated. As stated earlier, Dr. Ford also completed a mental assessment of Ascue in January 2011, concluding that he had no useful ability in all areas of work-related mental abilities evaluated except for one. However, for all the reasons stated, Dr. Ford's treatment notes simply do not support such harsh limitations.

For all of the reasons stated herein, I find that substantial evidence supports the ALJ's weighing of the physical and psychological evidence. I further find that substantial evidence supports the ALJ's finding as to Ascue's physical and mental residual functional capacity and his findings that Ascue was not disabled. An appropriate order and judgment will be entered.

ENTERED: March 16, 2015.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE